UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| CORNICE & ROSE INTERNATIONAL, L.L.C., an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| JON RICHARD ("DICK") HERBRECHTS-MEYER, GENE A. HALL, KURT HERBRECHTSMEYER, MARK MILLER, DIANE WOLFE, MICHAEL DOE and FIRST SECURITY BANK & TRUST CO., | ) ) ) ) ) ) | |
| Defendants. | ) ) | JURY DEMANDED. |

## COMPLAINT

Now comes Cornice & Rose International, L.L.C., an Illinois limited liability company ("Plaintiff" or "C&R"), by and through its attorneys, as and for its Complaint (this "Complaint") respectfully states as follows:

## PARTIES

1.     Plaintiff is a limited liability company organized and existing under the laws of the State of Illinois with its principal place of business in the State of Illinois.

2.     Jon Richard ("Dick") Herbrechtsmeyer, defendant herein ("Defendant J. Herbrechtsmeyer") is a resident of Floyd County, Iowa.

3.     Gene A. Hall, defendant herein ("Defendant Hall") is a resident of Floyd County, Iowa.

4.     Kurt Herbrechtsmeyer, defendant herein ("Defendant K. Herbrechtsmeyer") is a resident of Floyd County, Iowa.

1

5.     Mark Miller, defendant herein ("Defendant Miller") is a resident of Floyd County, Iowa.

6.     Diane Wolfe, defendant herein ("Defendant Wolfe") is a resident of Floyd County, Iowa.

7.     Michael Doe, defendant herein ("Defendant Doe")[1] (Defendant J. Herbrechtsmeyer, Defendant Hall, Defendant K. Herbrechtsmeyer, Defendant Miller, and Defendant Doe are hereinafter sometimes referred to collectively as the "Individual Defendants") is, on information and belief, a resident of Iowa.

8.     First Security Bank & Trust Company ("First Security Bank") is a corporation organized and existing under the laws of the State of Iowa with its principal place of business in the State of Iowa.

JURISDICTION

9.     Subject-matter jurisdiction is proper in this Court based upon diversity of citizenship pursuant to 28 USC §1332 (a)(1) as involving a controversy between citizens of different states.

10.     The matter in controversy exceeds the sum or value of $75,000 exclusive of interests and costs.

11.     Personal jurisdiction is proper in this Court because the Individual Defendants are each residents of Iowa, and First Security Bank is an Iowa corporation with its principal place of business in Charles City, Iowa.  This dispute arises out of the financing of a real estate development in Charles City, Iowa.

---

[1] This defendant is referenced as "Michael Doe" because, as will be discussed below, his identity is only known to Plaintiff through various documents in which Defendant Doe's last name is not used.

2

## VENUE

12.     Venue is proper in the Northern District of Iowa pursuant to 28 USC §1391 for, *inter alia*, the following reasons:  (a) the Individual Defendants and First Security Bank reside in this district, (b) the Individual Defendants, to the extent they are employed, are employed in this district, (c) First Security Bank conducts business in this district, (d) First Security Bank has offices, including its principal place of business, in this district, and (e) many of the events giving rise to this complaint occurred in this district.

## FACTS

13.     Plaintiff is a nationally recognized, Barrington, Illinois-based firm that provides architecture, construction, construction management, urban planning and real estate development services throughout the Midwest.  Plaintiff specializes in projects featuring traditional architectural styling and high-level design and construction standards.  Plaintiff's business model emphasizes involvement of the firm throughout the development process, from conception to design to construction to occupancy.  Plaintiff frequently become an equity participant in the projects in which it is involved.

14.     In 2013, Plaintiff became involved in the real estate development known as "McQuillen Place" ("McQuillen Place") in Charles City, Iowa.  In 2013, McQuillen Place was being developed by McQuillen Place Company, an Iowa limited liability company ("MPC").

15.     The idea behind McQuillen Place was to leverage a significant forgivable loan from the Iowa Economic Development Authority ("IEDA") to create a 45,000-square-foot, mixed-use development on formerly vacant lots in downtown Charles City.

3

16.     As part of a negotiated arrangement with MPC, Plaintiff's principal equity security holder obtained a 40% equity stake in MPC as part of its compensation for services. Plaintiff was engaged by MPC (and its affiliate) to provide goods and services (including architectural services and general construction-related services) for McQuillen Place.

17.     Construction financing for McQuillen Place was provided by Cedar Rapids Bank & Trust Co. (as lead bank with 10% participation in the transaction) ("CRB&T") and First Security Bank (with 90% participation in the loan) (CRB&T and First Security Bank are hereinafter referred to collectively as the "Bank Group"). The construction loan was secured by a first mortgage on the real property from MPC to CRB&T. The Bank Group does **_not_** have a perfected a security interest in any of the personal property of MPC. The contract rights of MPC, including its contracts with Plaintiff, are personal property of MPC.

18.     A public ground-breaking for the project was held in October 2014. Construction began in earnest in 2015.

19.     Largely due to actions (including defaults) by third-party vendors, construction on the project fell behind schedule.

20.     McQuillen Place is centrally located in a small town. Delays in construction, and periods where few workers on the project were visible to passersby, generated intense commentary by local citizens on social media platforms (particularly Facebook) and in various local social circles.

21.     In 2016, in response to, inter alia, such chatter from the public, representatives from CRB&T and First Security Bank requested detailed periodic reports from MPC concerning progress on several construction tasks (such as the amount of dry wall installed in various components of the building).

4

22.     Plaintiff prepared the requested reports, which were submitted by MPC to CRB&T and First Security Bank.

23.     In summer 2017, with more than 90% of the construction work on the apartments of McQuillen Place complete, MPC learned that a portion of the economic development assistance (the "Enterprise Zone Credits") originally promised by the State of Iowa would not be voluntarily tendered to MPC by the IEDA.

24.     The net benefit to MPC from the Enterprise Zone Credits was to have been in excess of $500,000.

25.     Following the news concerning Enterprise Zone Credits, the Bank Group refused to advance further funds to complete the construction.

26.     Immediately following the news concerning the Enterprise Zone Credits, MPC and Plaintiff attempted to negotiate with the Bank Group to find a way to complete construction on McQuillen Place.

27.     One proposal advanced by MPC (after it was initially suggested by a representative of CRB&T) was to have a third-party guarantor of the MPC construction note advance cash to MPC to finish construction, in exchange for the guarantor receiving a dollar-for-dollar reduction in the guarantor's obligations under the guarantee.  This proposal is hereinafter referenced as the "Dollar-For-Dollar Proposal."

28.     Although it had been initially suggested by a representative from co-lender CRB&T, First Security Bank subsequently refused to accept the Dollar-for-Dollar Proposal.

29.     The Dollar-for-Dollar Proposal was extremely favorable to First Security Bank and the Bank Group collectively.

30.     Rejection by First Security Bank of the Dollar-for-Dollar Proposal was commercially unreasonable.  Rejection by First Security Bank of the Dollar-for-Dollar Proposal appeared, at the time of the rejection, to needlessly derail efforts to complete construction on McQuillen Place, thereby decreasing the ultimate value of First Security's collateral and impairing the ability of any creditors or equity security holders of McQuillen Place to realize any return from the project.

31.     Another proposal (the "Loan Buy-Out Proposal") advanced to First Security Bank was for a third-party investment firm based in Chicago (the "Itasca Group") to purchase all of the right, title and interest of First Security Bank[2] in the McQuillen Place construction loan for an amount previously identified by First Security Bank as acceptable.

32.     The Itasca Group submitted a signed letter of intent to First Security Bank stating terms of the Loan Buy-Out Proposal, and requesting that First Security Bank permit the Itasca Group to conduct due diligence.

33.     First Security Bank refused to sign the proffered letter of intent.

34.     First Security Bank refused to engage in any substantive discussion with the Itasca Group concerning the Loan Buy-Out Proposal (or any other topic).

35.     The First Security Bank's actions concerning the Loan Buy-Out Proposal were commercially unreasonable.

36.     In February 2019, Plaintiff became aware of documents obtained in discovery (the "Excerpted Minutes") which provided insight into the conduct of First Security Bank.

37.     The Excerpted Minutes (attached hereto as Exhibit A) reveal that sometime after fall 2017 certain directors and employees (including, but not limited to, the Individual Defendants)

---

[2] In July 2018, First Security Bank acquired all of CRB&T's interest in the McQuillen Place financing.

decided that they were better suited to direct the completion of McQuillen Place than either MPC or Plaintiff.

38.     The Excerpted Minutes reveal a singular level of hostility toward key personnel of both Plaintiff and MPC.

39.     The Excerpted Minutes reveal that a goal of the Individual Defendants in the McQuillen Place transaction had now become replacement, by any means available to First Security Bank, of these key personnel from the McQuillen Place project.

40.     The Excerpted Minutes also reveal that the goals of the Individual Defendants now included removing the word "McQuillen" from the building's nameplate and scoring a public relations victory by assuming control of the construction project.

41.     Control of the appearance or name of McQuillen Place and advancing the Individual Defendants' own self-interest were not rights granted to First Security Bank under any of the McQuillen Place construction financing documents.

42.     Control of key personnel or vendors of MPC was not among the rights granted to First Security Bank under any of the McQuillen Place construction financing documents.

43.     To achieve their goals, the Individual Defendants caused First Security Bank to refuse to negotiate with MPC or Plaintiff in good faith, caused First Security Bank to commence litigation against MPC and other parties, and caused First Security Bank to refuse to consider (much less accept) any reasonable approach to finishing the construction of McQuillen Place that included the involvement of Plaintiff or MPC.

44.     The Individual Defendants and First Security Bank knew that MPC had engaged, either directly or as subcontractors, a number of parties to provide goods and services as part of the construction of McQuillen Place.

7

45.     The Individual Defendants and First Security knew that Plaintiff was one of the parties involved in contracts to complete construction of McQuillen Place.

46.     The Individual Defendants and First Security knew that Plaintiff was relying on the financing provided by First Security Bank to MPC for MPC to pay Plaintiff for the various goods and service it provided.

47.     The Individual Defendants and First Security knew that any wrongful termination of or interruption in the financing provided by the Bank Group to MPC would have a significant adverse financial impact on Plaintiff.

48.     The Individual Defendants and First Security knew or should have known that advancing their own self-interest at the expense of Plaintiff would have a significant adverse financial impact on Plaintiff.

49.     A corporate officer or director whose actions are not in good faith or are not in the best interest of the corporation exceeds the scope of their qualified privilege and may be personally liable in tort.

50.     The elements for a claim of intentional interference with a contract are: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." *Hunter v. Board of Trustees of Broadlawns Medical Center,* 481 N.W.2d 510, 518 (Iowa 1992), cited by *Jones v. Lake Park Care Center, Inc.*, 569 N.W.2d 369, 377 (Iowa 1997).

51.     In determining the impropriety of a putative intentional interference defendant's conduct, the finder of fact considers the following factors: "(a) the nature of the act or conduct, (b)

8

the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Jones*, 569 N.W.2d at 377.

52.     The questions of whether the officer or director has exceeded the qualified privilege, whether the elements of intentional interference with contract have been shown, and whether the putative intentional interference defendant has acted improperly are all questions of fact to be determined by the trier of fact. *Wolfe v. Graether*, 389 N.W.2d 643, 660 (Iowa 1986), and *Jones*, 569 N.W.2d at 376.

53.     According to the Excerpted Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on September 14, 2017:

> *Defendant J. Herbrechtsmeyer:*
>
> It is time to talk to [the manager of MPC]  …  Time to say [him] you are not in charge anymore and this is what you have to do and this is how you are going to do it.  *[Exhibit A, at 8]*
>
> *Defendant K. Herbrechtsmeyer:*
>
> Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly.  The rules are going to change and we are tired of it. [….]  *[Id.]*
>
> *Defendant Hall:*
>
> I would move to approve subject to the meeting.  If we have that kind of authority to tell [the manager of MPC] to get [another contractor] in here and get this done.  *[Exhibit A, at 9]*

54.     According to the Excerpted Minutes, the following colloquy (edited) took place at a "Board Loan Committee" meeting on March 8, 2018:

*Defendant K. Herbrechtsmeyer:*

[MPC is] saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that [the manager of MPC] can get this done and operate it. If the very least, they need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. [....]

The most is completing the windows. Windows on the first floor and completing the sidewalk. [We] are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff we have to be willing to take it on. [....] We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what [the manager of MPC] has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. [....] *[Exhibit A, at 12]*

*Defendant J. Herbrechtsmeyer:*

[T]here may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio. [....] *[Exhibit A, at 13]*

*Defendant Hall:*

I absolutely agree that if the bank finishes the project, [I] agree it will be a public relations windfall for the bank. I don't think anyone has any faith in [the manager of MPC] right now. If we do it, if that is the way it goes, I still have some reservations that Bob and [the manager of MPC] lose it, they lose everything, we take everything [the manager of MPC] has. *[Id.]*

*Defendant J. Herbrechtsmeyer:*

I can assure you one thing, Directors will pay to have McQuillen removed. [....] *[Id.]*

*Defendant K. Herbrechtsmeyer:*

[….]  The other prospect that pushed me across, other alternative was that we would have to deal with [the manager of MPC] on this, spending 3 years to get it leased up.  I have zero confidence in his ability to manage this.  So why wouldn't we have Connie or Dean run this.  From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody.  [….] *[Id.]*

*Defendant J. Herbrechtsmeyer:*

[….] PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it.  We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both.  [….] *[Id.]*

*Defendant Hall:*

[The manager of MPC] can't finish it and [he] can't run it.  I think it would be a public relations windfall and the sooner the better. *[Exhibit A, at 14]*

55.    Similarly, on February 21, 2018, Defendant K. Herbrechtsmeyer asserted:

James [Gray, principal of C&R] is the one that managed us to this point and spent all the money, rather than getting a good contractor. [Exhibit A at 11].

56.    During the March 8, 2018 meeting, Defendant Miller said:

"best thing for Charles City is to get control and put someone else in charge of it. ….  We could find someone else to complete and manage and potentially get it sold. [Exhibit A at 12].

57.    During the same meeting, during a discussion of McQuillen Place's prospects, Defendant Michael Doe subsequently stated:

I struggle with giving [the manager of MPC] the satisfaction of completing this as he has bungled it up and he is trying to get rid of the $500k.  [Exhibit A at 13]

Later, during the same meeting, Defendant K. Herbrechtsmeyer agreed with a point made by Defendant Miller, commenting:

I am only with you as long as there is a guaranty from [a third party] to the end and not having [the manager of MPC] in control of this. [Exhibit A at 15].

Defendant Wolfe added, in apparent agreement:

If [the manager of MPC] is being in charge of it, we already know it won't happen. [Exhibit A at 16].

At which Defendant J. Herbrechtsmeyer added,

With [the manager of MPC] involved, he still has his Chicago partner. [The manager of C&R] was so condescending to the City and to us. His enforcement has failed at the last 4 he has been involved in, [the manager of C&R] doesn't know. I don't think the guy in Chicago cares whether or not it gets completed. …. Once [the previous foreman] left and the clown running the thing, the drywall was incorrectly installed, that is where the big problem is. [Id.]

Another person then asked Defendant J. Herbrechtsmeyer:

If you don't go the foreclosure route to maintain control, will you have leverage enough to control it going forward? [Id.]

Defendant J. Herbrechtsmeyer responded (implicitly acknowledging that First Security Bank's then-existing documentation did not provide for the sort of "control" he was seeking):

I suppose we could have a written agreement with the contractor and when they get behind, we could start the foreclosure process. [Id.]

58.  The "clown" to whom Defendant J. Herbrechtsmeyer refers in the preceding paragraph is a disabled United States Marine Corps veteran hired by Plaintiff.

59.  In the immediately preceding five paragraphs, each of the Individual Defendants made at least one statement indicating that the rationale for the course of action they are urging upon First Security Bank was (a) a desire to usurp control of the construction process from MPC and Plaintiff in favor of some other party, and (b) a judgment that either their interests or that of First Security Bank would be advanced by having the real estate development activities of MPC directed and conducted by persons other than MPC's current management and vendors.

60.     In other words, the Individual Defendants were trying to induce First Security Bank, either on its own or through a proxy, to terminate MPC's CEO and breach MPC's contracts with Plaintiff.  They proposed to force MPC to accept this new arrangement by foreclosing on MPC's real property.

61.     First Security Bank owed McQuillen Place Company a duty of good faith and fair dealing.

62.     First Security Bank also owed a duty to known MPC vendors to not intentionally interfere with the contracts between MPC and its vendors.

63.     In urging First Security Bank to take actions to seize McQuillen Place, seize its development potential, and displace existing vendors of MPC in favor of vendors to be selected by First Security Bank, each of the Individual Defendants urged First Security Bank to intentionally interfere, *inter alia*, with the contractual relationship between MPC and Plaintiff.

64.     A secured lender on real estate does not, by virtue of a security agreement or a mortgage, gain the right to seize the assets of a borrower outright simply because either (a) the officers of the lender become convinced they can operate the assets more efficiently than their borrower, or (b) become convinced that ownership of the assets might somehow burnish the lender's corporate image.

65.     Notwithstanding their knowledge of the ownership of McQuillen Place and of MPC's contractual obligations, and notwithstanding their obligation, as directors, to cause First Security Bank to act in good faith in its contractual relationship with McQuillen Place Company and Plaintiff, the Individual Defendants concocted, supported and evangelized on behalf of a scheme for First Security Bank to seize control of McQuillen Place in order to, among other things, advance their own public relations agenda.

13

66. The scheme was to make First Security Bank appear as "heroes" rather than "bad" bankers, because it would be the bankers of First Security Bank who "showed up" and finished construction by drawing on their own funds and obtaining additional funds from other banks through new, senior debt on the property.

67. The plan advocated by the Individual Defendants was intended to exclude any other person or entity from coming in as "heroes" to finish construction, because the "hero" role was to be reserved for First Security Bank.

68. This reservation of the "hero" role for First Security Bank was recommended by the Individual Defendants without regard for or consideration of the possibility that, in terms of net returns, some other arrangement might have actually been more beneficial for First Security Bank as a corporation.

69. The sole option promoted by the Individual Defendants involved the bank seizing control of the future business prospects of its borrower so that First Security Bank could exploit its borrower's assets for its own gain.

## COUNT ONE
## INTENTIONAL INTERFERENCE WITH CONTRACT
### (Individual Defendants)

70. Paragraphs 1 through 69 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

71. The tenor of the comments of the Individual Defendants indicates that they were motivated not by concern for the assets of First Security Bank, but by pique at one of McQuillen Place's principals, by pique at Plaintiff (and/or its primary equity security holder), by the desire to inflate some or all of the Individual Plaintiff's own standing in the local community as "heroes," and by an inexplicable (and irrational) desire to change the nameplate on the building.

14

72.    The Individual Defendants accordingly intentionally advocated cutting off negotiations immediately and commencing a legal action as quickly as possible.

73.    In so doing, the Individual Defendants acted in bad faith, intentionally interfered with the contract between the Plaintiff (and Plaintiff's affiliates) and MPC, and caused damage to the Plaintiff.

74.    A direct result of the actions of the Individual Defendants is the outstanding, unpaid invoice of MPC to Plaintiff (the "Partial Invoice," attached as Exhibit B) of Two Million Five Hundred Sixteen Thousand Eight Hundred Fifty-One and 30/100ths Dollars ($2,516,851.30).

NOW, WHEREFORE, Plaintiff demands judgment as follows:

A.    Against each of Jon Richard ("Dick") Herbrechtsmeyer, Gene A. Hall, Kurt Herbrechtsmeyer, Mark Miller, Diane Wolfe and Michael Doe (jointly and severally) and in favor of Plaintiff for the amount of damages sustained by Plaintiff as a result of the Individual Defendants' intentional interference with Plaintiff's contractual relationship with MPC and its affiliate, including, but not limited to, damages in the amount of the Partial Invoice;

B.    Compelling each of  Jon Richard ("Dick") Herbrechtsmeyer, Gene A. Hall, Kurt Herbrechtsmeyer, Mark Miller, Diane Wolfe and Michael Doe (jointly and severally) to indemnify and hold harmless Plaintiff from any loss or damage arising from or related to the Individual Defendants' intentional interference with Plaintiff's contractual relationship with MPC and its affiliate;

C.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and bad faith conduct;

15

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## COUNT TWO
## INTENTIONAL INTERFERENCE WITH CONTRACT
### (First Security Bank)

75.     Paragraphs 1 through 74 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

76.     First Security Bank, at the suggestion of the Individual Defendants, adopted the policies supported by the Individual Defendants vis-à-vis MPC and Plaintiff.

77.     As a result, First Security Bank intentionally interfered with Plaintiff's contractual relations with MPC.

NOW, WHEREFORE, Plaintiff demands judgment as follows:

A.     Against First Security Bank and in favor of Plaintiff for the amount of damages sustained by Plaintiff as a result of the Individual Defendants' intentional interference with Plaintiff's contractual relationship with MPC and its affiliate, including, but not limited to, damages in the amount of the Partial Invoice;

B.     Compelling First Security Bank to indemnify and hold harmless Plaintiff from any loss or damage arising from or related to the Individual Defendants' intentional interference with Plaintiff's contractual relationship with MPC and its affiliate;

16

C. Granting appropriate equitable relief to remedy First Security Bank's breaches of fiduciary duties and bad faith conduct;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## COUNT TWO – MALICIOUS INTERFERENCE WITH BUSINESS ADVANTAGE

78. Paragraphs 1 through 77 are, by this reference, restated in full as if reproduced in this paragraph in their entirety.

79. The Individual Defendants, in urging First Security Bank to seek control of McQuillen Place through the vehicle of foreclosure, acted with malice toward Plaintiff.

80. The comments of the Individual Defendants, both in isolation and when viewed in the context of the deliberations of policy-making entities within First Security Bank, demonstrate actual malice against Plaintiff.

81 The Individual Defendants knew, or should have known, that their actions would cause injury to Plaintiff, specifically with regard to the financial affairs of Plaintiff.

82. The Individual Defendants' actions in urging First Security Bank to seek control of McQuillen Place were wrongful.

NOW, WHEREFORE, Plaintiff demands judgment as follows:

Now, wherefore, Plaintiff demands judgment as follows:

A. Against First Security Bank and in favor of Plaintiff for the amount of damages sustained by Plaintiff as a result of the Individual Defendants'

17

intentional interference with Plaintiff's contractual relationship with MPC and its affiliate, including, but not limited to, damages in the amount of the Partial Invoice;

B.      Compelling First Security Bank to indemnify and hold harmless Plaintiff from any loss or damage arising from or related to the Individual Defendants' intentional interference with Plaintiff's contractual relationship with MPC and its affiliate;

C.      Granting appropriate equitable relief to remedy First Security Bank's breaches of fiduciary duties and bad faith conduct;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**Jury trial demanded on all counts.**

Dated: March 3, 2020                              Respectfully submitted,


                                                  CORNICE & ROSE INTERNATIONAL,
                                                  L.L.C., an Illinois limited liability company

                                                  By:/s/ Charles M. Thomson  (AT00010387)
                                                      One of his Attorneys

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

Exhibit A
Certain Documents From First Security Bank

**7-17-2014**

Following review and discussion of the following lines of credit, the following were approved unanimously with actions indicated:

**McQuillen Place LLC**

  Requested:  Lending Limit and Total Serviced Debt $3,900,000

  Robust Discussion held.  Further information needed.

  Motion by Gene A. Hall to table, second by Robert D. Noble

**8-4-2014**

Motion was made by J.R. Herbrechtsmeyer and seconded by Kurt W. Herbrechtsmeyer, and unanimously voted to bring back to the table, McQuillen Place request.

Keith Starr presented the following additional information regarding the McQuillin Place:

  7-2014 Projected Construction Cost

  Supplemental Information regarding the apartments.

  7-27-2014 Rent Report

  7-27-2014 Rent Projection

  7-27-2014 Square Feet of Building

No action was taken.

**8-8-2014**

Motion was made by J.R. Herbrechtsmeyer, seconded by Kurt W. Herbrechtsmeyer, and voted to approve (Boyd A. Campbell – Voting No), either of the following two loan options:

**Option 1**
**McQuillen Place**
**Guarantor/Co-signers:  Charles M. Thomson, Robert Thomson**
**Contingent upon Charles City TIF loan.**

  Lending Limit      $1.95 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2 million to be repaid over 15 years.  Robert Thomson would continue to guaranty $900,000 of this debt with $500,000 of that guaranty being secured.

  Total Line Commitment   $1.95 million

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in. Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**Option 2**
**McQuillen Place**
**Guarantor/Co-signers: Charles Thomson, Robert Thomson**

|   |   |
|---|---|
| Lending Limit | $1.45 million loan for 25 years, contingent upon the City of Charles City approving an upfront TIF loan to McQuillen Place for approximately $2.5 million to be repaid over 20 years. Robert Thomson would continue to provide an unsecured guaranty of $400,000. |
| Total Line Commitment | $1.45 million |

Charlie Thomson would guaranty all of the debit providing mortgages on all real estate properties that he owns individually or has an ownership interest in. Also, he would assign a $2 million life insurance policy on himself to the bank, as well as, his ¼ interest in a $500K life insurance policy on Robert Thomson that would represent his share as a beneficiary of that policy.

**9-15-2014**

Update was given on the McQuillen Place. Negotiations are still taking place. City has not yet committed to the up-front TIF. Robust discussion was held.

**10-16-2014**

Email, verbal or phone response votes, which are attached as a parts of these minutes, were received from J.R. Herbrechtsmeyer, Kurt W. Herbrechtsmeyer, Boyd A. Campbell, Gene A. Hall and Robert D. Noble and the following was unanimously approved:

**McQuillen Place**

|   |   |
|---|---|
| Lending Limit | $3,500,000.00 |
| Total Serviced Debt | $3,500,000.00 |

Advisors Keith K. Eastman and Ronald McGregor submitted approvals.

**6-8-2015**

**Mark Miller presented the following line reviews:**

**McQuillen Place Company LLC, Guarantor/Co-signer: Charles M. Thomson, Robert L. Thomson & Amelia Management LLC** – Nothing new to report. This line was approved in January. Cedar Rapids stays involved until the building is up, then the commitment will be between First Security Bank, First Citizens and the City for a take-out commitment. Cedar Rapids Bank and Trust was involved due to the significant amounts of grant money and they are overseeing the draws and overseeing the project going forward. We have Bob Thomson's guarantee in place in the amount of $900 thousand to cover 2 years of payments for the end loan. Discussion was held regarding tenants and disagreements between Dean and Charlie. Mark advised that he is not aware of any tenants lined up at this point. Motion was made by Gene A. Hall and seconded by Robert D. Noble, and unanimously approved:

> **McQuillen Place Company LLC,**
> **Guarantor/Co-signer: Charles M. Thomson, Robert L. Thomson & Amelia**
> **Management LLC**
> Board Approved Lending Limit      $3,500,000.00
> Board Approved Total Serviced Debt      $3,500,000.00

## 6-9-2016

**McQuillen Place Company LLC, Guarantor/Co-signer: Charles M. Thomson, Amelia Management LLC, Robert L. Thomson ($900,000 limited guaranty)** – This line has a construction note that matures end of June. There is a tour scheduled at 9:30 a.m. Monday, and a meeting with Gary Becker, the lead bank on this. The reason they are the lead, is there are many grants involving FEMA and other entities that have had more experience with this. We are going to be meeting on Monday with Charlie to get a tour of the building and hear what the plans are going forward. Gene – This construction note matures June 30, and what happens if they come up here and take a look at this? Mark M – We are going to have to make a decision. They haven't used all their line of credit and monies are not all gone. We have been matching up the progress in relationship to the project. Bill H – Final note is contingent on completing the building. Mark M – We need some updated financial information. I can talk to Charlie directly, but I feel with them being the lead bank, most of this should be going through the lead bank. We need updated financials, status reports in relation to where the work has been done and advances on LOC's. If we had the loan maturing June 30, what time frame are we looking at for completion? And lastly, what is the status of the first floor as far as tenants are concerned. We think there is none, but have not had any confirmation from reliable sources. Steve – The question I would ask, there was 6 vehicles on site that had workers, how can you finish a project with only 6 men on site? Mark M – The only answer I have gotten, is that it is going to take longer, but we are spending less to get to the end. Steve – When they are this far behind schedule, he will never get ahead. Steve advised he would come out of retirement and finish the project, if needed. Gene – I have a number of concerns with this. He is so far behind schedule, a year behind. Steve – How will you get this done with one plumber and one electrician? Dick – I learned there are 20 furnaces in town to put in. Mark M – One of the things talked about, there is some discussion about being able to rent apartments in one part of that before the whole building

is completed. I believe that is an accurate statement that this can be done. We will see how far along they are. J.R. – The City Manager told a group that information last week, but had some caveats that needed to be done. J.R. Herbrechtsmeyer – I move we approve where we are. Loan Committee will be talking about the renewal once questions are answered. Boyd A. Campbell, seconded, and unanimously approved:

> **McQuillen Place Company LLC,**
> **Guarantor/Co-signer: Charles M. Thomson, Amelia Management LLC,**
> **Robert L. Thomson ($900,000 limited guaranty).**
> Board Approved Lending Limit     $3,500,000.00
> Board Approved Total Serviced Debt     $3,500,000.00

## 2-2-2017

Gene – Any updates on the McQuillen place? Dick – Mark has toured the place. The elevator is built but won't be delivered until MidAmerican gets in. MidAmerican is getting easements from Ralph for the north end trench before McQuillen gets hooked up.

## 4-21-2017

McQuillen Place – Kurt W. Herbrechtsmeyer – I vented frustration at the "haste" that this project is going forward. One other thing, is the argument for their pace, it is cheaper for them to keep their labor costs down than paying us interest. This request is an extension until the end of June, and they need to get this thing done. We will review the rate at that time. Gene – If this is an extension through July 1, so they can finish this, I don't believe them. Kurt – No, this won't get finished then. If they are going to tell us, it is cheaper than to pay us interest, we can change that equation. Gene – There is no cash flow and no leases are signed. Kurt- The argument is, if we get an army in here to finish this up, we would have to pay premiums, and they need to do this to stay on budget. I don't think they factored revenue into this. Very frustrating. We send the message now, this needs to get done, rate will change on July 1 and if they want to talk to a different lender they can, as the rate at that time will be 5.25%. Mark – This is a participation that we purchased form Cedar Rapids Bank and Trust and we got involved on the front end. The biggest chunk is coming from FEMA, which Cedar Rapids Bank and Trust have had experience with this. We thought it was better to have them involved to make sure things were done correctly. In hind sight, their oversight has not been as good on this. We see this daily, they come up infrequently to do inspections. We went through there the last time with representatives from First Citizens and the City. Their oversight has not been what we thought it to be. Gene – Do we have any choice, what is the alternative? Kurt – The rate adjusts. We have not given them any indication we wouldn't, but truthfully, this is the time to tell them what is going to happen next time. I have lost faith in Charlie to get this done. I would like to make it clear to him we are done. We want to see this get done and be a success, but he has to do everything he can to make that happen. If he doesn't have a signed lease by now, we need to get his attention. Mark – We have not increased our loan commitment, they are not coming in at this point in time asking for more money to get this done. We did get information on other sources they have money to draw from. It would be nice to know they could get this done for the amount of money they have left. When done, it needs to generate income. Boyd – We have 90% participation. From the time this is going to be completed, we are going to have a time in between that this is going to be bad. Mark – That is why we have the guarantees we have. At this point, the biggest

guarantor is Bob Thomson. Boyd – He stopped at $900 thousand. If we have a year of nothing in between, is he willing to step in and give us some more? What are we going to do here? Gene – My understanding is it needs to get built. Once built, whoever is the second owner can come in and do something with it. Boyd - If it doesn't get built? He needs an incentive to get this done and get to work on this, and needs to be over there and make sure they are working. Gene – What is the contract language regarding interest rate? Kurt – Default adds 2%. Mark – I would advocate, the right approach is get the extension done, have Gary Becker up here sometime in May, First Citizens, and Charlie, and do another tour and advise it doesn't look like it is going to get done, what is the plan? We did have a meeting in August last year, we were pretty harsh at that point in time, and we got some good dialogue and need to have this dialogue again. There is no signed lease yet. Gene – They are looking at other locations. Kurt – This one is not going to get ready. As we are getting to the finish line, June 30 might be a great opportunity, if there is progress on it and the end is in sight. Now if he doesn't have any leases, he has to put a date out there. Bob - Why does Charlie not feel this urgency to make this happen? Mark – The real issue they continue to bring up, they can't get enough labor, they thought they were going to import people from Chicago, for some reason, they have to have 2 forms of ID and the people don't. That is their argument. Last time they had 12 people working and there was no general contractor. For a while, they had Alex Heinz, they had sub-contractors doing things. Boyd – If we get this done, what is going to be our occupancy rate, do you think? That year after it is done and trying to fill it, cash flow is going to be absolutely bad, that is all on us. Mark – We are looking at the commitment letter from Citizens. Citizens had to have a year's reserve in payments, theirs is $900 thousand, City is $900 thousand and ours is $1.5 million. They have to have a reserve for one year's worth of payments set up, so they have the time to get that building filled. Gene – The dialogue has to be the rate is going way up July 1, so get it done or don't, the rate is still going up. Kurt – We want to create a sense of urgency to finish and get FEMA money. Mark – Cedar Rapids Bank and Trust said it is cheaper than paying a high price for getting a whole bunch of labor in there to get it finished and this was in August and they continue the same dialogue. Gary is not helping us with that participation. Diane – From his perspective, he is in Cedar Rapids and we are looking at it every day. Gene – Did Timko take over that board down there? Steve Crawford told me Timko was going to take over that board and this would help expedite this. Mark – I asked Gary for information and he sent back, well we just kind of trust them. Charlie said, every time we make a request, they know this. Gary was nonchalant. Mark-I told them we are not very happy about a third extension and the non-urgency of getting this completed. This matured March 31. We are looking at this physically every day and we are not happy about it. Gene – I think we have to extend it, but the message has to be loud and clear. Mark –I will line up a meeting with all potential parties involved with final financing and get Gary from Cedar Rapids Bank and Trust and do another tour. We are tired of it. We want it finished, get it done. Kurt- It is time to let Charlie know he needs to go find some help financially, he needs a little push back from somebody, that this might not end well. Mark –If we get another tour lined up, if any of you would like to be included, let me know. Boyd, Gene and Bob advised they would like to be involved in this. We will get a meeting lined up and invite you. Boyd- We need to show up. Mark-We want to have a sit down meeting and tour. Bob – When is the time to discuss rate? Mark-Cedar Rapids Bank and Trust has all their documents ready at 5.25%. I would like to stick with this but clearly communicate that come July 1, if this is not done, that rate is not anywhere close to where it needs to be. Gene A. Hall made motion, Boyd A. Campbell seconded, and it was unanimously

VOTED:    To approve the extension of the construction loan for:

**McQuillen Place Company LLC**

**Charles M. Thomson/Amelia Management LLC/Amelia Trust/Robert Thomson ($900k)**
$3,491,993.32 Line of Credit at 5.25% to June 30, 2017, with the provision that if the note is not paid by July 1, the rate defaults to the maximum, will not be extended, and the loan stays at the default rate

and

approve the loan policy exception – Term of construction longer than 12 months.

## 6-8-2017

Schedule of Customer Renewals – This was reviewed. Gene – Question on McQuillen, how did he take the interest rate we presented? Mark – There was interest rate discussion. We are trying to line up another tour this week. The elevator was installed, but they now have a problem with the doors. We asked about certificate of occupancy, he thought maybe he would have that by June 15. We did plant the seed that the interest rate would be higher and there might be some performance based pieces factored into the rate, such as occupancy certificate and occupancy levels. Dick – Is our guarantor aware? Have we had a conversation with Bob, as it is about down to where he will have to subsidize some payments? Mark – Every year, he does a financial statement, this is listed as a contingency liability. As far as having a deep discussion with him, I have not. $900 thousand during construction loan will be $500 thousand once permanent financing. Dick – My fear is he may not be getting the whole story of the concerns and it might be time. I would be willing to be part of that discussion with Bob. Discussion held. Gene – All those properties Charlie has, there is no equity.

## 8-17-2017

J.R. Herbrechtsmeyer advised regarding McQuillen Place. Gene – Since he has everything for sale and even though there may or may not be any net worth there, whatever net worth there is, is supposed to be pledged to the bank. So, if he started piece mealing this off, how concerned are we that we get our share? Kurt – I have seen the Renaissance Revival package and it is $1.2 million or $1.4 million, if he finds someone to buy this. Gene – I don't think this would prohibit him to sell what he can when he can. Dick – The big chunk of the stuff he bought from Brian Crane, we have the first and the kids carried back a second. Brian owned the corner where McQuillen is at, which raises an issue I hadn't thought of, I hope there isn't a second with those folds and there was not a second mortgage ahead of that transfer into the new entity that is building McQuillen, because he bought that from Brian as part of the package. What he did, is add a little line of credit, made payments, but borrowed back on the LOC, which is secured on the first mortgage, so, all of a sudden his 5 years are up and has shown no progress with us. I gather Mark said no, we are not interested in doing this over. As far as net worth, any net worth he thinks he has is nothing, unless he has picked something up. Kurt – It is 12 residences – commercial properties. Dick – He may have improved the value of that property, he put in a lot of storage units back behind there, which you can't see from the street and claims he has them all full. Bill – Did he buy the Brick and Tile Building? Randy – No Jeff Tierney has that. Kurt – His own home is in this package, Mark Melrose is in 206 N Main, the North Grand, the duplex on Harvey, rental on Johnson 15th Ave, and

Riverside Drive, brick building next to the bar, Kellogg and Jackson street. Diane – Mark and I had a conversation with Gary Becker and we are trying to get the package together for the extension of the LOC. One of the things they asked us to do is a walk through because in the cash flow, they are talking about having occupancy as of September. They are closer to this, but that date will not happen. There were only 3-4 doors that were put on the apartments at this point. Dick – The area where he wanted to rent, the doors were done, the rest were not. All the plastering had to be done. Diane – They were going to put windows in yet this week. Kurt – They have to Sheetrock all the common areas. Diane – All major hallways have that and it is painted. They are making progress, but will not hit September 1. Gene – Did Dean Snyder take over that construction? I know he was asked to bid on it and finish it. He did bid. Diane – There were only a couple people working when we were there. Dick – It did not look like activity such as Dean Snyder would have. Gene – Even though he may have taken over, he may not be there yet. Kurt – He has leased one apartment to a school teacher. Robust discussion held. Diane - On Monday, Charlie wasn't here, we walked through with their construction manager. They have pavers now in the area between the two sides of the building. Have several doors on the outside of that area. What is done looks nice.

## 9-14-2017

**McQuillen** – Dick advised of several questions to start. Last time we toured, Charlie was told there were 3 apartments left to be sheet rocked and taped. Two days ago, the one in the corner still appeared to have sheet rock know leaning against the window. Mark – I will schedule a time to get there next week. Dick – The elevator was supposed to be inspected and he has not reported to you. Dick – Both things needs to be done. Mark – The elevator is not required. I think we are just waiting for the state to inspect. Mark – To summarize the request: The new pieces are the construction LOC that matured the end of June and has not been renewed. There is a different on interest rates, and it will be the same thing on both notes, at 6.25% with the lead bank, so net to us will be 6.0%, up from 5% from before. The floor on this loan is 5.75%, and net is 5.5%. There are 100 bp performance objectives on both these loans. When they get certificate of occupancy, the rate drops 50 bp, another 25 bp when the residential units are rented and another 25 bp when they have 3000 feet of retail space rented. They could drop the rate by getting certain things done. There is a second note, which we are not encouraging, for $422,900, we would have 90% of that, which is the request, same interest rate structure on this and the repayment source on the balance of the IEDA funds of about $200 thousand, then the balance will be enterprise tax credits they have to sell to repay that. CRBT would not advance on the LOC unless they had proof that credits will be sold to pay back loans. The total dollar amount proposed will potentially be the same for the second note. Dick – They presently are past due since June 30 and we had a kicker in there, are they paying interest monthly? Mark – The accrued interest on that has been paid fairly recently, but I need to check on that. It is at the default rate. Dick – I think that would be a tremendous incentive. Mark – From Charlie's perspective, not sure if he has been as much the reason It is at this point as the two banks involved. We had asked for detailed information regarding remaining construction costs, that is why we have the second note. Dick – Snyder came in and did this? Mark – No. Dick – So we have not seen Snyder's construction costs? Mark – No. Charlie had brought that up not that long ago and that he thought it would be wise to get a bid from someone else. 1 – What is that amount? and 2-How quickly can you get someone like that that is fairly busy to come in and do the project, but this might be quicker than the route they are taking right now. This is slightly encouraging, has there been someone actually looking at apartments. Dick – Not the most impressive realtor

showing it. It would be nice to see what Snyder says. Charlie seems to say what he needs to, to move on. Gene – What has been factual since the start of this? It was supposed to have been done 2 years ago. Mark M – Original construction maturity date was June 30, 2016, so we are over a year past that date and we have extended the construction loan four times. Gene – What happens if we don't approve the extension? Dick – Cedar Rapids could foreclose on it and we own 90% of that note and Citizens is willing to take $1 million when completed and the City has $1 million, so when completed we would have less than we do now. Mark – That is assuming that they will keep their end of the bargain. They have not indicated we are out, but we haven't really put them on the spot. As I think about the permanent financing commitment we had, we could easily say we are out, but that would be short sided on our part. Dick – We are out but we are already in for our commitment, we can't get out. Mark – It would take city and ours and others, based on performance of construction loan, if there are different things we would want to include in the end financing, we have every right to negotiate. For example, have $900 thousand limited guaranty from Bob, with permanent financing to drop to 500 thousand. When we get to the point of permanent financing, we should revisit some of those terms, as they haven't met expectations on the construction loan. We could easily come back out on permanent financing but the bank's perspective, that would be a worst sided process but from the other banks perspective, might be more helpful to raise the bar in those types of things. That isn't what is on the table today, but when we get to that point when we are doing the permanent financing, those things are on the table to be revisited. Gene – if Dean Snyder does not get involved in this other than his estimate, are we confident for extending this for 5.5 months? Are they going to be done in 2.5 months if someone else does not get involved? Kurt – I would say not, probably next spring, if lucky. Mark – I think they will have certificate of occupancy at that time and maybe start renting apartments. One of the groups we have talked a little bit about that are different than some individuals renting an apartment. I believe there is some interest from Midas, Cambrex, Zoetis, that when they bring people into town to work for more than a day or week, they like to put them up in someplace better than the motels in town. They have expressed in each of those maybe having 1 or 2 apartments to have available. That is a pretty good start in getting some rented and cash flow. Dick – Are we wrong to say after 15 months of lip service, we want to see who the tenants are, name, contact information and have Mark from Chicago and obviously Cedar Rapids, we want to see what Snyder said it would take to get it done and what it would cost, and talk to Cedar Rapids and say you either get it done or else. It is time to talk to Charlie. There are only 3 not complete. Time to say Charlie you are not in charge anymore and this is what you have to do and this is how you are going to do it. Kurt – Let him know we have lost the desire as he can't complete the project. He needs to take notice and act accordingly. The rules are going to change and we are tired of it. I don't think he can complete it. Dick – He was hurt when he was asked if his guarantor was aware of this mess. Bob could have been off the hook if Cedar Rapids had not contacted to acknowledge another extension. If we approve this, I don't see we have a choice. We have more in it now if it gets done and we need to make sure it gets done before the middle of winter which may mean to fire current staff and get Snyder in there. Kurt – He doesn't demonstrate that he is paying any attention. Over and over again, he tells us we have this working, going to get things done, etc. We were there in May and he was going to get a certificate and they still don't even have the sheetrock in. He is disconnected from the project. Something June 1, something July 1, he needs to hear we don't have any confidence he is going to complete these things. Dick – Let's get a sit down with him. Cedar Rapids should be more than willing too. Kurt – Give him the message he may need to find another lender on this. Dick – Part of the problem with the public is they are not seeing anything on the first

level. His logic is, he has to get a good tenant there and then finish. Kurt – If he would have gotten apartments and occupancy 9 months ago, there would be no question. Dick – That is the minimal we have to do before we have to approve it? Gene – The thing is Charlie has no skin in the game, if he walks away tomorrow and declares bankruptcy, he is not losing anything. We need to get the project done so we can escape. Dick – We need to have a heart to heart talk with Bob Thomson make him aware of what we are doing to try to save his $900 thousand guarantee. Bob is also over 90.

Charlie did say he signed the deal for $7 thousand-$9 thousand to have the punch list done over the objection of his partner. Gene – I would approve this subject to the meeting such that all parties are apprised of what we are thinking. Discussion held. Mark – Cedar Rapids Bank, Charlie, maybe Bob Thomson in that same meeting. Ron M – Bob with his hearing problem, it is tough to know if he is going to absorb everything out of a meeting. Dick – He needs to be at the talks. Mark – We can try to get something lined up, mid-week next week. Dick – It is worth doing.

Gene – I would move to approve subject to the meeting. If we have that kind of authority to tell him to get Dean Snyder in here and get this done. Dick – We can say if we are going to extend it, we want a week by week schedule of what you are going to get done with your people and if you don't do it, bring Snyder in to finish. Mark – We should have the document showing what it will take to complete it. I don't think we have the ability today to say you have to hire, but if they don't perform and we have an agreement then we would. We would have an attorney write this. Again, we are not the lead bank in this. Dick – Call Gary Becker. Kurt – Encourage him to hire someone to finish the project. Dick – I would Mike to see a Snyder punch list and ask if he had thoughts about hiring Snyder to finish.

Mark – If approved, subject to these things. We will have a meeting with Bob and get estimate from Snyder to finish, agreeable that they could provide an estimate of time table. Dick – He is supposed to have that. Diane – He did say he paid money to Dean Snyder to have it done. Dick – If we have a punch list. Robust Discussion held.

Motion was made by Gene A. Hall, seconded by Robert D. Noble, and unanimously

VOTED:             To approve the following:

McQuillen Place Company LLC

Extend Note #9300025611 in the amount of $3,872,602.92 (Construction Note) to 12/15/2017, with lead bank CRBT and FSBT 90% of the note. The second note is for $422,900 with CRBT as the lead bank on this note as well. FSBT would have 90% of this note as well and it would maturity on 12/15/2017. The Interest rate on both these notes is 6.75%. After lead bank takes .25% for servicing, the net to FSBT would be 6.5%. There are 3 different performance incentives on this note that could drop the interest rate 1.0% if completed with a floor interest rate of 5.75%.

Guarantor/Co-signer: Charles Thomson.

Robert Thomson ($900,000 guaranty)

All the above is subject to the meeting of all parties such that all parties are apprised of this.

Mark – Once a meeting is scheduled, make everyone aware to attend.

## 12-22-2017

Discussion regarding the proposal from Charles M. Thomson and Robert L. Thomson on the funding of the McQuillen project. Robert L. Thomson is willing to inject up to $500,000 cash into the project with the condition that his $900,000 guarantee during the construction phase being reduced by 0.50 for every dollar injected (total of $250,000).

Dick motioned to approve, Gene seconded and it was unanimously

VOTED: To approve the following:

McQuillen Place Company, LLC
Reducing Robert L. Thomson's guarantee as mentioned above

Subject to the following conditions:
Cedar Rapids Bank & Trust Special Assets group agreeing to the proposal
The City of Charles City agreeing with the proposal
Reviewing the appraisal that was ordered in November 2017
Cedar Rapids Bank & Trust drawing up an agreement with Charles M. Thomson and Robert L. Thomson documenting the expectations of each party.

## 2-21-2018

Boyd Campbell - Any update on McQuillen? Diane - We are waiting right now to have a meeting set up with the Cedar Rapids Bank, we have contracted an attorney out of Cedar Rapids that is going to spearhead our efforts that we have to do. We are going to have all the parties involved, bank, other bank, Charlie and Bob, as well as Bob's attorney. Dick – We decided it was time to have an attorney represent both banks. Bob feels this is a man who will move it along, looking for a resolution. Gene - Have they settled on a contractor to finish it up, and if so, how much? Dick - Bob has come in with his contractor. There are still some questions. The workout guy from Cedar Rapids Bank, on a scale of 1-100, he is 80-90, and the loan officer on the same sale of 1-100 is a 4, so we improved ourselves a great deal with this workout deal. He does this, moves things along. Psychologically, that Bob is jumping in to get a contractor that he has used in the cities, that means Bob is more committed than just the numbers he has seen, and he wants this done. It is nice to have someone in that family to understand timeliness is more important. We will know more after this meeting. This will be held in Cedar Falls/Waterloo office of the subsidiary bank of Cedar Rapids Bank. Diane - This hasn't been scheduled yet. Adding to Dick's comments, the original proposal that James and Charlie put together, put us at $428K to complete

and the contractor that Bob is involved in, looked at everything. All totaled, it wasn't a lot different than what Charlie and James had put together, about $500K. There are still some outstanding items aside from that, accounts payable, interest and taxes. So, for Loan Loss Reserve, we used a total of $900K to complete the project, and that is a guestimate.

Kurt - So the objective will be to get information from them as to how to move forward. Also Bob's guaranty, whether used or not, it comes to us, making sure if capital is put in, it gets spent well. Charlie just seems to be paying attention to everything about this. Boyd - Is there a question about Bob's guaranty? Kurt - His guaranty is to us, not a cash infusion to the project, so technically, we can ask him for the $900k, he has to pay us. That puts us in the position, do we put it in the completion of the project or come up with Bob to put some money into this? That is what Bob had proposed, put $500K in, reducing the guaranty. We also want to see the $500K get spent well. Hopefully, we can get this thing moving forward. Dick - Didn't Bob's guy have a later completion date? Diane - Yes. Dick - There is very little to be done on the apartments. There are 2-3 apartments that didn't quite get drywall done, some repair, flooring in the hallway. There is still a thing on the first floor with the City on steel structure with the drywall and fire. That is why they changed the goalpost on it and the City said no, you didn't understand the city code. I don't know that he and Charlie are on the same page. Kurt - James is the one that managed us to this point and spent all the money, rather than getting a good contractor. Dick - It doesn't look like it when you drive, by, but we have made good progress. Gene - $500K, is that to complete the entire project? Dick - Not the 1st floor. Original cash flow covered the debt. as you get cash flow on the second floor, you have cash flow to cover finishing the first floor. Kurt - If we can get Bob to commit money directly, he has some ownership and we need to keep him engaged. Boyd - When do you talk to Bob about this to get him moving forward? Dick - He had a CPA. You have $900K from Bob who has the moral to take care of it. Get the $500K, get a decent contractor and go. Cedar Rapids did not want to do that. Diane - When I talked to Dave from CR, when we have this meeting yet to be determined, that is going to be negotiation day, and it may very well be that we end up back at that, but he doesn't want to throw that out now and not have anywhere to go, that is why he is playing hardball. Kurt - Let's not give that up. Dick - I like what this guy is doing, he was calling Charlie every day, sent him a past due notice, what do you have to offer. Next day, he was calling again. He tells us his lawyer is the same sort of guy. Nothing we can talk about on the street. It is frustrating to hear conversations at Aromas. People are just looking for answers. Charlie needs to get it done.

Bob N - So, this meeting will be when? Diane - Probably in the next 2 weeks. Bob - Diane and Dave are moving it along faster than we were. Diane - They have offered to get out. The big thing that I don't want them out, is we had a $500K government deal that went away and I sat here and listened to this man from CR, you contact so and so and he can get it done. We put CR bank into this because of their ability to handle those. I hope we never have to go there, but I feel the CR bank has a lot of stink on their fingers for $500K. Our State Senator got the economic development lawyers and they explained it was allocated but never funded. We were never told.

## 3-8-2018

McQuillen Place Updates – J. R. Herbrechtsmeyer -Credit Committee has been meeting on this, as well as loan committee. Michael had good input on this and then Mike had an idea of a possibility, so I thought this is one that we will be talking about at the Board of Director meeting, and want as many people to think this through. Kurt- Technically, we are still in negotiation, Diane met with Bob's attorney, his accountant, and where we are, basically Bob has taken a step back on the $600K, he said

$900K is his limit of exposure, which is really basically where we already are. We have Bob as a guarantor for $900K on construction, where we still are in that phase, with a verbal agreement to be a $500K guarantor on the permanent financing, giving us something to go back on while getting it leased out. So, first is to get it completed and second is operating. They are saying, let us have the money and we will finish it. Because we are negotiating, there needs to be more consideration for us in this. We don't have the faith that Charlie can get this done and operate it. If the very least, they need to come back with something other than what we have. They are not in a position to dictate the terms as to how this is finished out. I don't think we are in a better position if we stay with them, but get out and find someone else. We are willing to do that. Our counter is going to be, no, we are going to start foreclosure and put the ball back in their court to come up with something more serious to consider or foreclose on it. What we talked about in Credit Committee, how would we approach that foreclosure and what are we willing to do. Mark Miller joined the meeting via teleconference. Their offer as of last Tuesday did not offer anything more than what we already have. Offer is not any better than if we took control and had someone manage and lease. Credit Committee - Take control or they come with a better offer, with the full realization we could end up with the property and some fallout, liquidating assets that we need to be aware of. Best thing for Charles City is to get control and put someone else in charge of it and it will take some of our capital but we will have Bob's $900K. We could find someone else to complete and manage and potentially get it sold.

Dick – A couple of things that were discussed. We now have a joint lawyer, one legal entity. so far, Charlie has shown up representing himself, other than when Judy O'Donahue was involved when the $500K went away. Cedar Rapids bank has offered to take us out and you guys run it. I think they have enough egg on their face, they were paid fees up front to manage this. I sat in this room and listened to their lender say to Charles that the $500K tax credit is past due, but those are extended all the time. That $500k that never happened would have gone a long way toward us not being shut down for 90 days. Secondly, we asked the lawyer to look at the Federal and State money and what has been put into this thing and see what the obligation is, if we were to foreclose or if Charlie were to sell it to another entity. Do those requirements all stay in place or is there any draw back. Gene - How long do you think this will take? Dick - I think we have part of the answer. Diane - The grant money, there is mortgage and second position, if we foreclosed, it would be the same as foreclosing on another entity. Diane - The IDED that the funds came from, but the NIACOG is administering the grant and that's why it's from Cerro Gordo County. Dick - That was my guess, but it is strange that the real estate in Floyd county will have a mortgage from Cerro Gordo. The question is still foggy, he has said over and over, he was required to have 1 more than half of those apartments and he was talking about subsidizing. Kurt - That is a second mortgage, but our understanding is, unless they want to buy us out, we have no obligation. Dick - that is why I wanted to be sure we had all those facts before we start. Kurt - City side - Dick - I hadn't gotten it through my head, Ralph is concerned the City is going to walk away from that, I don't think our City Manager is a bluffer, he wants it done, as they convinced the city to a TIF loan, and it must be completed, and if not, those that are in there, will need to move out. Kurt – The most is completing the windows. Windows on the first floor and completing the sidewalk. we are putting ourselves in a negotiation position that is very firm and we are willing to back it up. They may come back with Bob saying I'll put more money in, they may not, if they call our bluff, we have to be willing to take it on. No, Mark, it will not be your project. We talked about how we could be the developer, mention about reputation risk, I severely doubt that we are going to take any reputation risk on this after what Charlie has done to himself. When we show up, finish, lease, add windows and sidewalks, we are going to be the heroes. Dick - One other part on the loans, I had written off that Citizens will have anything to do with it. The Citizens bank loan has the other half of the TIF, so if some entity owned by CVB, Ltd. owns this thing, there still could be TIF grant up front paid back over years and a loan to the City through First

Citizens and whoever owns it pays for it. In our credit meeting we discussed, if Citizens doesn't want to do it, there may be some other bank out there willing to make a loan on the cash flow, first lien ahead of us, willing, so I think there is $1.8M that will come over our debt as it is now, between the two TIF things. We are at about $3.8M, it certainly looks a lot more feasible that the $1.8M will come in, not out of our loan portfolio.

Gene -I haven't had a chance to study all of this, I absolutely agree if the bank finishes the project, i agree it will be a public relations windfall for the bank. I don't think anyone has any faith in Charlie right now. If we do it, if that is the way it goes, I still have some reservations that Bob and Charlie lose it, they lose everything, we take everything Charlie has. Dick - I can assure you one thing, Directors will pay to have McQuillen removed. It would be nice and I don't know how we get it, the list of people that want to rent, whether there is anyone or not. Gene -I can address this. Coincidentally, I had another conversation with a director yesterday that confirms there is a list of people waiting to rent those apartments. Dick - Will it be a list we can get our hands on? Gene - It is through Larry. Kurt - Obviously, we may realize we will hold this for a long time, we need to get it leased up. Quality of the construction in those apartments concerns me, cabinets, flooring, don't want to say we are going to take it and put $1M into it and sell for a profit. Dick - There is no question, I would never live in this based on what we were saying. Floors were plywood with a little paint on it. Kurt - That is the environmental aspect they were required to meet. Not sure where this came in, maybe goes away with NIACOG. The other prospect that pushed me across, other alternative was we would have to deal with Charlie on this, spending 3 years to get it leased up. I have zero confidence in his ability to manage this. So why wouldn't we have Connie or Dean run this? From a public relations standpoint, if we could get a drugstore, with the possibility of Kmart not being here, if Dean or somebody. Mark - Have you had any conversations with Dean about that? Mark - I have not. Either he or Connie will work with us on it if they owned it. Dick - Is there a way if they would both work with us. PR wise if we step in and finish it, I am sure there will be people thinking bankers are bad, but there will be a lot of others that worry about the community, that somebody stepped up and finished it. We can use the same argument with Gene and Connie and we need to get it done and be beneficial to both.

Michael came up with a discussion about an entity that might own this. Michael - During the financial crisis, we got a lot of land and properties back. In those cases, certain institutions that did not want to absorb, created an LLC, basically sold real estate to the holding company. In that instance, those asset qualities, OREO if long term, doesn't impact the bank's asset quality and no performance assets. The only time you would see it would be at the audit at the holding company level. You will need to talk with FDIC and the State to get the blessing to do that. I don't see why they wouldn't. What might have to happen, you might have to divvy up capital to get it finished. If the building was owned by the holding company, it would be divvied up by the holding company. Budget around long term issues. Regulators don't like banks holding OREO long term, as we are not real estate development companies. The other things, you mentioned the pharmacy, one big thing from what I have heard, they wanted a drive up-that would be a change in plans and is additional capital if we want that anchor tenant. Charlie doesn't have that. When you start to build out the tenants, there is reduced rent, cash flow out of capitals or concessions on rent, all of which I don't know Charlie can absorb with his current situation. Last thing, I don't want to own this, but at the same time, even if we let Charlie and Bob finish it, I don't think apartments are going to cash flow, so we will still have a non performing asset, which will impact our books for eons, as this will not support any long term financing. We can work through this, but I struggle with giving Charlie the satisfaction of completing this as he has bungled it up and he is trying to get rid of the $500K. Michael - If we allow the $900K to go in, we are giving up our collateral. Kurt – And, we are giving up control. Michael - The appeal of some 50% reduction in whatever Bob was going

to put in. Dick - Steve Durrs said, made me feel better, the redo of the parking is still on the table, if that building gets completed, to add 88 spaces, with a timeframe of next summer. Kurt - But we have to have the building done by November, so they can put that in there. Dick - Steve Durrs is definitely on our team to get this done. He is not taking sides of one bank over another, simply City Administrator to compete and look good on main street. I am very encouraged after meeting with him. I keep hearing from Ralph, that Delaine was not okay with this going in. Kurt – Delaine's concern was Charlie, no cash, no back up. Michael - The other thing Steve mentioned was the TIF, the agreement has to be rewritten, it doesn't matter if it's to McQuillen LLC or to the bank, it needs to be rewritten anyway, if ownership has changed, the new owner would be written into this. Dick – There is no way we are going to lower our assessed value on it. The other thing I raised briefly is the $500K that went away, at some point, we are going to have to have our own lawyer, because when we start taking some charge offs, we feel we have reason to go after Cedar Rapids bank, they bungled. The notice to the State was sent out a long time ago and going back to the minutes when Cedar Rapids banker said to Charlie, you see so and so, that guy can get that extended, the state had gone away with that program by then and grabbed what little money they could for other projects. Cedar Rapids bank didn't have a clue. Boyd - How feasible is that is what they are saying on the $500K, going after the Cedar Rapids bank? Dick – One, being a good politician, our State Senator has tried to do what he could, got the Economic Development lawyers to sit down with us and explain why we weren't going to get it. No question that Waylon Brown made that happen. But Cedar Rapids bank has offered twice in the last 2-3 weeks, just take us out and you guys run it. They would be happy to write off the same percentage we do, as they are only in it 10%. Kurt - There will be an opportunity for them to take their haircut and walk away. Dick - I would like them to take the haircut and put the big fees back in. They should be as embarrassed as we are that this is not done. Gene - We almost have to be complicit as possible. Dick - We at least raise the issue and try to get them to come up with something other than just losing their percentage. Gene - Is Bob's reputation separate from Charlies? I think if push came to shove, how much is that McQuillen place going to mean to Bob? Kurt - That is what we are trying to find out. Dick - At one point, they offered us $500K with $250K coming off the guaranty, that would commit Bob a whole lot more. The number got bigger. He is going to have to make that decision. Gene - Charlie can't finish it and Charlie can't run it. I think it would be a public relations windfall and the sooner the better.

Dick - We have to pay the taxes. I don't think we have to get our interest paid. Cedar Rapids Bank wants this, but they may have to write this off, a lot less than what we would have to write off. Cedar Rapids Bank is not offering to make any concessions. I believe this man wants to get away from this as fast as possible and probably has some perimeters to work with. Gene, how long will it take to force the Thomson's to a decision and moving on? Kurt- We want to show them we are moving forward. In the meantime, the way we have proceeded in the last few years, once we say we are doing it, we do it. Dick - With Boyd on this call, we have 4 out of 9 directors present. When we say to Cedar Rapids bank, the Directors Loan Committee has to approve this. It is all about Bob and are you really walking away from this and it not being called McQuillen Place? Kurt - We will liquidate all. Michael - On that point, that is the forced and bitter foreclosure process. I am throwing out there, in the best interest of that building on the corner of main, we may have to give some concessions to Charlie. He doesn't have any equity, we get all OREOS back, I know that the emotion and the involvement is there, but we have to make good decisions in trying to get possession of the building as soon as we can, whether voluntary or foreclosure, that should be on the table, otherwise, we will stare at this, pay legal fees, discuss at every board meeting and in 15 months when we finally get possession, just thinking long term. Dick and Kurt - Bob does not want this to happen. Dick - Another thing Michael brings to mind, Tommy gave a list of every loan we have with Charlie and what the collateral is, we know what Connie has them listed for, probably 80% more profit. I am told he actually has had an offer on his house, more than assessed, but

turned down. Kurt – Amelia Management is the 3 remaining living kids, but that brings Peter into this, you will get the family rallied pretty quickly, and they are all affected by this. Charlie can't fight through this on his own, with Bob involved and everyone, it will be to table pretty quickly. Dick - The first foreclosure will be the farm over by the river, that is a farm that was Jan's and then the 4 kids, foreclose, then partition out. Kurt – They won't want that to happen, undivided 1/4, probably has no debt on it. Then have cousins that are forced to buy out 1/4 of a half. Mark M- Our mortgage on that is either $125k or $150k, what was negotiated as part of it. Our LTV on all those properties, we should be in a pretty strong first mortgage position, but every one of those were financed with seller financing, the equity beyond second is minimal that would be available for a 3rd mortgage that applies to the McQuillen loan. The other thing we have talked about all along, first thing Bob would have to do, is have him write his $900K check. But we speculate the attorney, with a limited guaranty, they are not going to write a $900K check on the front end, but wait to liquidate all, then determine if we are truly $900K. That is why we want to negotiate that up front in a voluntary settlement agreement. I don't think there is much equity in the Amelia properties, as most of those were purchased less than 5 years ago, so not a lot of equity.

Diane - I tossed that question to the attorney in Cedar Rapids, about waiting until all properties were foreclosed on, before we would ask for the $900K, but the attorney said they can't dictate to us how we get the collateral, we can ask for it up front and we can get it up front. Dick - Bob has offered to write the check. Mark - He has offered. Is he still going to offer, once we start the foreclosure, it may change. If he doesn't, we may be a long way from getting a check. Dick - I would rather see the $600K and still have some guaranty on the cash flow. Mark - If Bob is using his contractors that he is using for Pancheros, I believe bob is committed to getting the building finished. Bob has the money. Charlie is not capable. If he puts $900K or $600K and we maintain some of that guaranty, I think we get all that back, then construction loan comes due, if they could get finished using Bob's better scenario for us. Kurt-I don't disagree with you, but I don't want to give up that guaranty. Mark – All we can commit to at this point in time, is the construction loans, when matured and the building is completed. If that is finished, Bob may say at that point in time, the cash flow is there. He won't say that today. Ultimately, this is Bob's legacy. He has a lot of respect for the bank. Dick - You make one comment, Bob's contractor at this point has not given us any concrete numbers. We or Cedar Rapids bank has never seen anything form Bob's contractor. Diane - Charlie had sent a document that shows where they said, you are short on this, need "X" amount of dollars or more, not totaled. Mark - This is something that I had mentioned to you already, we don't know Bob will step forward, we can speculate he will. The way I look at it is, he is kind of stepping/walking away right now regarding the $900K, he has already played his card. Dick - Is that why there has been nothing from Cedar Rapids Bank with Bob's contractor? Diane - They are considering Bob's contractor.

Gene - Hold their feet to the fire. Kurt - Michael is right, we have to sit down to the table and work something out. Dick - This is where Mr. Breitbach will have to give us some guidance. Kurt - I think we do want to force the issue and get to a resolution. Diane - Keep in mind, just getting through the construction is only part of this, then how is it going to turn out? Mark - Getting it completed, increases value and sale ability, maybe not at the levels we want to, but at a level to find a buyer. It is not saleable, as it is not finished. Even if you lost the guaranty completely, if it gets finished and we start getting apartments rented, it increases the value by the amount and maybe more, only reason we are considering this, it gets money up front and he has a contractor that can actually do the work. Kurt - I am only with you as long as there is a guaranty from Bob to the end and not having Charlie in control of this. Michael - One thing to consider, Steve did say that the TIF loans do not go anywhere, until the building is done. He is talking about sidewalks, the doors, when you start adding that up along with real

estate requirements, I don't know if the $900K is enough. If we go the path using Bob and his contractor, he is going to have to put more than that into it. Diane - One thing Steve said, it can't just be a painted piece of plywood, it has to be windows. Kurt - They were not in that scope. Certificate of completion, not occupancy. Bob needs to be on the hook for all of that, that needs to be the agreement, if we are going that route, it has to be completed. Gene - There has to be a deadline on it. Diane - If Charlie is being in charge of it, we already know it won't happen. Dick - With Charlie involved, he still has his Chicago partner. He was so condescending to the City and to us. HIs enforcement has failed at the last 4 he has been involved in, he doesn't know. I don't think the guy in Chicago cares whether or not it gets completed. Bob needs to know Charlie's partner is a detriment. Diane - Steve would be the general contractor and be here 2 times a week, but he has a foreman who would be here every day. Michael - Is it still local contractors? Mike - From what I understood, I think it is still the people building it, but we just have someone overseeing it now. They are not just bringing in a construction crew to complete it. We now have someone overseeing it that knows, but you still have the same 4 guys constructing. Dick - Once Alex left and the clown running the thing, the drywall was incorrectly installed, that is where the big problem is. The architect says it's not a problem. Three more feet of 3 layers of drywall for fire protection to get the initial certificate. He implied when that foreman was there, it appeared they were doing everything right, but when they hired someone off the streets, that is when it went awry. Ron - If you don't go the foreclosure route to maintain control, will you have leverage enough to control it going forward? Dick - I suppose we could have a written agreement with the contractor and when they get behind, we could start the foreclosure process.

Michael - We have reserved $850K, that was for year-end audit current reserve on it. Dick - I put out, we are making a $1M profit this month that will go into AAA, I think that gets offset by McQuillen place. At the very least, $1M charge off before we are done with this project. Michael - It will lose value if the banks name gets placed on it. Kurt - That is why I think you lease the place up and market. Dick - I like the idea of an entity other than FSBT. Next step is to get back to the attorney representing the two banks. We will have to talk to the Board about it next week. Michael - What is the decision? They want to know if we want to move forward with foreclosure? Kurt - Offer is not good enough, moving forward with the foreclosure. I think we will hear back pretty quickly. Dick – The person from Cedar Rapids will have the paperwork ready and file. I am not sure 48 hours is enough for Bob T. Kurt-Communicate quickly. If they come back with something and we are considering it, we are going to have to deal with Cedar Rapids bank. Diane - I think they will say if you aren't foreclosing, we are out. Dick - Do we need to get legal counsel representing just us, to say if you are out, we will take you out on these, pay back fees. Mark - Is it in the file of what their fees are? It should be. Kurt - We need to find out what they have gotten. Dick - If the mortgage is in their name, they can thumb their nose and foreclose. Diane - I suppose they could. Up to this point, they have let us be the decision maker on where we go. Dick – I think it would be safe if they are going to do that, and ask if they have looked at their liability on the other things. Mark – I did mention that to David once, I am sure he has forgotten about that. Diane – What I had conveyed to Dave was Board Loan Committee meets today and at this meeting, is where the decision would be made. I was wrong and it needs to go to the Board of Directors.

Kurt - I am not convinced this committee needs to approve. Diane - It is either we are foreclosing or we are not. Kurt - I don't think there is anything in our policy that says this entity has to approve. Dick - I think if you tell them we are either foreclosing or let us know, Dave will give them 30 minutes and foreclose. I think we need to give them a reasonable time. Mark - I think a week is ample time. Diane - I counter that and say give them until Monday. Mark - The problem you have with that is, you don't have one person in and they are working with a new attorney. Michael - They got back within 24 hours

with the previous. Diane - I don't think we should wait. Dick - How about Wednesday? Kurt - Bob is in a position to make this whole thing easy. We need him to decide whether he is willing to do this or not. Diane - That is why it shouldn't take a week to make a decision. I just think that is too long. Kurt – A couple days, communicate this. Diane - Give them until Monday. They have the weekend to figure it out. Gene - If I was going to lose over $1M, I would be making a decision real fast. Diane - They have had time to figure this out. Michael - If Diane is right, and Bob says, you have heard my offer and it could be today. Gene - If he doesn't, I would file foreclosure papers this afternoon. Kur t- Give due notice. Diane - I will tell Dave we are in agreement to go ahead with foreclosure, give until Monday to counter. Kurt- Do we want to say that? Diane – What I am saying, I tell Dave that, so he doesn't file the papers today, giving Bob the time. Kurt - All we tell Dave is that we understand there is a guarantor that can make this easy, give him the opportunity and then move forward. Michael - Dave can communicate we are going to file the papers on such and such and they then know the deadline.

## 6-21-2018

McQuillen – Mark M. - Negotiations with Cedar Rapids Bank and Trust - We are dealing with relationships and trying to resolve and get on the same page. Mediator with Thompson's and the attorney, we are trying to reschedule, as the Thomson's didn't want to meet without the mediator.

Discussions between the banks and Charlie have been evasive. First Security is more interested in resolving this than Cedar Rapids bank who has less incentive to push. We will threaten to sue Cedar Rapids Bank for damages for slow movement and lender liability. First Security Bank has a separate attorney. We have sent options and if they don't choose either, we will start the lawsuit. We think it is better to have one bank involved and making the decisions. Taxes are paid by First Security instead of Cedar Rapids bank who is the lead bank. Cedar Rapids Bank and Trust hasn't started foreclosures on any other properties. Cedar Rapids Bank and Trust never had the actual Enterprise Tax document to show approval with 2 options. 1) Cedar Rapids Bank and Trust has 10% of the loan and they offered to walk away from 5% of this. First Security Bank presented that Cedar Rapids Bank and Trust pay the bank $1 million and walk away, we don't file a suit. 2) Cedar Rapids Bank and Trust pay 80% of First Security Bank loan amount and real estate taxes and First Security no lawsuit. We want to get moving toward a resolution.

FSBT Board Meeting – McQuillen Excerpts:


**4-16-2018**
Progress on McQuillen place was discussed.

**5-21-2018**
J.R. Herbrechtsmeyer discussed information regarding McQuillen.  Robust discussion was held.

**8-20-2018**
**Credit**
McQuillen Update – Kurt - We have reached an agreement with CRB&T and they are no longer in the equation.  We obtained assignment documents and a $50,000 check.  Dick - We have also obtained insurance on the building and Larry is pursuing foreclosure.  Discussion held.

**9-10-2018**
Diane gave an update on McQuillen.  Robust discussion was held.

**10-15-2018**
Diane gave an update on McQuillen.  Robust discussion was held.

Credit Committee Excerpts – McQuillen

**4-21-2016**
Purchased Loans Report – McQuillen, Mike F – Are we following up on what we need? Mark M – We are getting reports, but I haven't gotten one recently. Not much was done over the winter, but they are working on it now.

**6-28-2016**
Pipeline Report – McQuillen Place – unused and looks like it is going to sit there for a while. Dick – A more optimistic view – the City is saying they could have 12 apartments they could have ready in August, as the plumbing was roughed in. They have 12 on the south side, 2nd and 3rd floors. Mills Helmers has 20 some furnaces they are storing, the sheet rockers was ready to start on those 12. Mark – They are working inside. Dick – The City is not going to give them any ability to rent, they have to have at least the sheetrock on the walls. At the rate they were going, they could have roughed in all the fire suppression. It is conceivable those could have been ready on time. They talked about one lease and building sale at the end of the street that could put a damper on this and is spending some money there. A Bluhm truck was there this morning. We should tell Charlie Thomson we want another walk through to see the finishing on the inside. Mark – The LOC matured June 30, and we have a request going to Officer Loan Committee to extend this to December 1. They have to have certain things done prior to year-end to qualify for some of the grants for this. Robust discussion was held. Michael H – We should add our work outs to this report and add one more column for this. We have another $8 million to $15 million in loans that are still on the book. There are real dollars that are not on this report that are going to roll off.

**10-10-2017**
Diane – Dick had wanted to talk about McQuillen. Kurt – His concern is there might be some urgency with regard to maybe setting the expectation about Bob's involvement, his is a guaranty on the loan which comes in to play when trying to collect. Obviously, it could be an infusion of capital too. Michael – My feeling is, based on what I know, we are on the hook until it is done, because the other participants don't step in until it is complete. My argument is, our goal is to get this done as fast as we can to reduce exposure. Kurt – Dick bought up things that need to be completed. I don't know where the City and Charlie are on that, to get certificate of occupancy. Dick's concern, is pouring concrete when the weather changes, but certainly something we want to be thinking about, is getting those things done and the certificate. The other thing going on, is Department of Economic Development at $700K. Charlie sent an email and asked to make contact there. Mark M – Dick said he talked to Waylon, who knows what their stance is on this, there is what we can do and what we can't do. Mark – Even if you had the money, who is going to do the work? Kurt – What are the options, what should we be thinking of as priorities, can we inch something forward? Mark M – Personally, what I think we need to do, we have the stuff from Dean Snyder construction, there is never going to be funding to support that, $2.5M plus and Charlie and James number was over $400K. Second request at Board Loan Committee was supposed to be covered by tax credits. What we need to see, is: 1-You need to get accounts payable of all bills out there. We have one customer, Kamm Excavating that they still owe $7,000. 2-Then an itemized list of what it takes to get to the finish line and provide a timeline of when that finish is. 3-We will come over and do a checklist to follow up and see that you are following through. With this

timeline, you will need to meet weekly. 4-Then we will figure out permanent financing at that time. We need to get it finished. The certificate of occupancy, we could depart this, but you still need to get stuff done and who is going to live in there if it is not done, they all need to be finished. Kurt – Or enough to get people to move in. Michael – Where is Cedar Rapids Bank and Trust on this? Mark M – Gary Becker, his rationalization, that I heard more than once and did not agree with, their approach was to keeping the cost low to get the project done. The interest cost was not hurting him. Now I would say, it and he has clearly moved on that point. Michael – Do we have any recourse on them in terms as to how they handled this? We brought them in as experts in construction and development. Mark M – Weren't they overseeing the grants and the project, didn't they get the documentation that all of that was in place? I thought they had this, but at it turns out, they didn't have it, we didn't have it, so there was a question about let's look at the participation agreement. We have 3-4 extension agreements and changes each time. I don't think there is going to be anything in the participation agreement but will come back to original plan. We are a participant and not the lead bank, we assume you have that and where is it. Charlie communicated that to me first. Mike F – Has there been any question that Cedar Rapids bank is lead bank? So lien waivers, making sure no money went out? Mark M – How this enterprise tax credit got missed in this question, I don't have the answer to that. I am not sure if we have any leverage there. In the short term, we are at mid-October, there are certain things that can only be done at a certain temperate level and soon to have those behind us. Bob is the guarantor, but that doesn't mean he should have to write a check, but he has the ability to do that. Come up with some money, get the project finished, can then reimburse once you get tax credit. Mike F – What is total debt? Mark - $3.8K and we are in the $3.3M range. Michael – Dean Snyder's was $2.5M to complete. Mark – I think there could have been some coaching in that number. Show us your number and how you got to it to finish the project. Supposedly Cedar Rapids Bank had something to support. Mike F – What kind of documentation have they sent. Diane – Sporadic. Mark M – In discussion, a document was noted, but we had never received or have seen the document. The funding, available source, what had been spent, matching up to completion of the project, we haven't seen this. Mike F – Have we extended? Mark M – They have $100K left of IED grant. Mike F - Does anybody outside of our bank know we are concerned? Does anybody know we think we might suffer a loss on this? Mike F - We are in a position to suffer a loss? Michael – As it is now, if you want to have it completed, it would be discounted to finish it. Kurt – To me, getting that $900K infused, it either has to go to the loan or be put on loan. Michel – I would have them pay down and re-borrow. Mark M – If you brought somebody else in that does these kinds of projects, what would it cost? That is your back up plan if you had to hire someone to finish it? We asked and he went out and got an estimate. Mike F – We are in a position, if the lead bank hasn't shown signs of normal lending due diligence, it is just because they have a small piece of it, doesn't get them out. I think I would probably find somebody in Des Moines and send them the shop list. Kurt – We could certainly have someone looking at that. Mark – We need to set up a meeting again with Charlie and Cedar Rapids Bank in the room. They have breached the contract. Mark – Let's get the building finished and then discuss this. Diane – What if we explore the participation agreement and whether or not they have been negligent. Mike F – How many visits have they made up here? Have they constantly monitored the construction of the building? Mark M – What they wanted to do, they had this Ron Fiscus, a financial guru, and they wanted to use him as an inspector, but he was someone that Charlie had hired to be part of this, and they deemed him unacceptable. They got somebody else. Michael – I would ask them for a complete imaged file. It is ours as much as theirs. That should include everything. Mike F – Did they earn loan fees? Mark M – They collected significant loan fees on the front end. Mike

F – What have they done? Michael – We hired you as an expert, if you can't do it…. Mark M – Until this thing is done, you are in. Diane – The other thing to talk about is, right now, it is a 5, it should be a 6. The other thing, how do you allocate for it, collateral analysis is not going to do anything. Michael – If you are in construction and land development, you are advancing on a completed basis. I don't know the answer to that, but what I don't know is, where did the funds come from? Let's say it's not $2.7M or $400K, probably somewhere in between. Mark M – That is what we need to get from them. Michael – If you can get the completion and get First Citizens and the City to take their part. Mike F – What is the time table, how long can this go on? Mark M – We have had representation from Citizens there, when we toured and they have been part of the meetings, they could have easily said at any point in time, we are just out. Michael – I think they understand there is some reputation on the line. Kurt – I think there is, that is why we want to get to completion. There is a lot of reputation risk. Mark M – That is why we need to get to completion. Kurt- We don't know how to reconcile Charlie and Dean's number. They had a basis for asking, my gut tells me it is closer to their number. Mark M – We have to get James and Charlie. Diane – They have been asked twice to do that. Mark M – Cedar Rapids indicated they had that information, I don't believe I have ever seen that. Mike F – The City signs off on inspections? Do they sign off? Michael – When I did mine, they did. Mike F – Snyder may be concerned, is everything up to code. How would they know inheriting a project like this that they can trust everything that has been done? Michael – My experience with the City, is, they put the gloves on and do everything. Kurt – They were asking for over $400K. Here is a question for you, if you could get Bob's $900K, would you throw the $400K in to get this done. Permanent Financing is $1.5M. Mark – Bob's was supposed to be knocked down. Kurt – I want Bob's. Mike – If we go the whole course, Citizen's is just short of a million and the City's is short of a million. Michael – The cash flow is at what occupancy? Mark – If you had all the apartments rented, you would not need any retail. Michael – I would be surprised if it got 50% leased up on the apartments. Mark M – What we have heard all along is, that you have some of the employers in town that would like to have 1 or 2 of the apartments, Cambrex, Zoetis, Mitas. Kurt – I would think they would do this. But you would still have to get your 50% low to moderate. The sooner we get to that point, the better. Diane – The obstacle I see is, who are we going to get to finish it. Kurt – We need to work with them. Diane – Couldn't we pursue this? Michael – You need the whole file. Mark M – Part of what we are requesting is, we want itemized accounts payable still outstanding, a list of improvements to get to the finish line. We could easily say, give us what you have to this point and we would like to see the whole file as to expenditures, lien waivers, inspections, etc., because we should have that in our file. Mike F – Any reports of any unpaid labor or bills? Mark M – We have one – Kamm Excavating of $7K accounts receivable that hasn't been paid. Mike F – That is my biggest concern. Kurt – I remember when we were all sitting in this room, Dick asked it twice and he said no. Mark M – I want to see an itemized list of accounts payable and what are you going to have to pay to get to the finish line. If they don't have it on there, there may be others out there that concern me. It would be nice to get the list to see if it isn't on there and that would concern me. Michael – I think there is a couple things we could do internally, whether one of you or Tommy, look at our different options, how much did we put into it, look back at the initial plans to cash flow, are we going to have more in it, if it gets to us or Cedar Rapids, are we going to add more money to get it finished. Do you end up with a property you can't lease? I also don't want to wait 6 months and have not thought about those options. Kurt – Quite frankly, if you can convince them that Bob's $900K goes in next, get it complete, that at least gets us closer to the end in sight. I ranted at Charlie when they were in here a few weeks ago, as I wanted Bob to hear this. If I was Charlie, that is where I would want to be. Mike F – I have a feeling that there is

a Credit Committee that has been held recently that is very concerned! Michael – Tell the lead bank to put the dollars in to finish this. It was their obligation to see this through and they agreed to that dollar amount. Kurt – We have to figure out what is the best course to get it completed. Mike F – Holding the lead bank accountable is not a bad option. Getting them to the table to participate in what it takes to conclude this. Mark M – We would get their attention if we ask for a complete copy of their file. Michael – One second, before we push forward talking about getting more infusion of capital, at what point are we stepping on the lead banks toes and opening up to a liability. I want to make sure we are not having any meetings without them. Mark M – We are not. From a course of action perspective, what we need to do is go through Cedar Rapids Bank and Trust first and have them contact Charles and James and tell them we are available. I think we need to let them be the lead bank, these are the things we should be getting. Michael – Since we are at the end of the financing, my stance is until we have a plan, we are not taking any more exposure on. Kurt – We certainly want Cedar Rapids Bank and Trust on our side pushing. If they are sitting in the room and we think the $900K is what is necessary and CR sits quietly, that is not as good if we are all on the same page. Charlie is also pretty smart and if he starts doing the math, he may say, here are the keys. Mike F – Their story was, here are the keys buy us out. I can't trust someone who does that. Michael – They want out. I want to see the whole file. Someone has mismanaged it. I don't know why they ever took it on. Mike F – They are a very high growth bank, saw the fee income, someone can do this. Michael – It seemed like a good deal with all the state funding.

## 10-20-2017

Diane – I think we just wanted to touch base on McQuillen before next week. Different conversations have been going on about what the plan is for Monday. Mark – I understand the CR Bank & Trust banker is going to be here. Dick – Should we be having a conversation without the borrower with them, so that we are all a united front of what we are expecting from Charlie and James. Mark M – We should be letting CR Bank & Trust lead the meeting. We told them what we wanted to see on the agenda. They tweaked it and are adding a few things. They have our items on there, they need to lead the meeting. Dick – Is the city involved? Mark – They are not coming to this one. Dick – We need to be honest with the city as to what we are, as they have the potential of loaning a million dollars on this project. Mark – If the city stays in and if Citizens would stay in, we take our $3M down to $1.5M, but a lot less dollars we are looking at. Honestly, if we get to that point, if it is finished, we have the opportunity to negotiate terms with the guarantors. Bob is going to be guaranteeing $900K. I have already planted the seed in Charlie's mind, that when the construction is done, the terms on the permanent financing will probably be up for debate. Dick – We are not going to have much leverage at that date. They have none of their own money other than Bob's $900K. Mark – We have a farm. Dick – It will cost us a ton of money to get anything out of that, it is better than not having it. Mike F – Are they not doing any work at all? Dick – There are as many as 4 people showing up there on the job, it is pretty limited. Diane – One of the things they are supposed to be bringing to the meeting is their timeline. What if they don't bring us anything? Dick – That is where we have to be set with the CR bank. We need to move next door and talk with Gary. We need to go in and talk about foreclosure. We already have the city ahead of us on taxes. Michael – I don't know if I would put Bobs CD on the table, I would rather have CR Bank take it and finish it out. If they boggled it up along the way and didn't get it completed under the costs that were initially disclosed, I would hold that back in our cap until we have to. Dick – The $900K is actually a guarantee on their loan.

**11-14-2017**

Diane – McQuillen – We had a meeting which I will send to Kurt and Dick. We are meeting tomorrow with Charlie and Gary Becker is coming. Mark M – I met with Bob, not relating to this, I had an extension for him to sign on his son Steve's note. Bob Thomson brought up that he is fully behind getting that building built, we are talking $400K at this time, and if takes more than that, he will provide the funds. We need to get that building finished. A week ago, he said that he was working with his accountant to figure out what the transaction between him and McQuillen would be. Tomorrow there is a meeting here with the Iowa Department of economic development, where Charlie is hoping to bend their ear and get his tax credits back. They need to fund this gap and get the building finished. Diane – Michael, you talked to Greg and Randy and they are suggesting we get a new appraisal. Michael – They said given the size of that and the value of the building as it is now or the value to someone from a collateral standpoint, there is no income generating from it, there is going to have to be some type of valuation set up. It is sub-standard. It is not a Charles City appraiser that is going to do this. In order for them to sign off on the allowance and say it is adequate, you have a building supporting a loan. Dick – Let's ask Gary tomorrow if he is getting a new appraisal on this for their reserve. Their initial recommendation is to put it back to Cedar Rapids, they do more of this, that they would know better how to evaluate a cost to complete and a cost as is. I hope that the reserve in time can reverse itself. Even if we get the building completed, we have a competed building with no income, and it is probably not going to be sufficient to set up an amortize basis, it may be interest only basis, to help get leasing going. All things we are going to have to decide as we move along with this. They said the timing is bad. They come in and have to audit allowance and sign off that our reserves are adequate. What do we have for allocation? Michael - $100K. Diane – What is our allocation for next month? Mark – One of the thing, he would ask Bob to submit his $900K first, take off the top, then the farm and another $150K. I think I would start at those things from the top and then work from there to look at an allocation. Michael – Obviously we are in a position to where we know Bob's financial status, clearly we know Bob is most likely pretty good for the money, so I think you can consider that. So, whether it is the collateral you have, say around $900K, some farm, you have to factor in your cost to get all that and I don't know how much extra value that adds, you can probably consider all that, but again, as you are getting closer to year end, those are things we need to ask them about. Cedar Rapids Bank and Trust provided us with an appraisal, to get one in the time frame, you would almost have to go back to the individual that did the initial appraisal. That same appraiser may be able to come back. Dick – He did it based on plans and now he can walk through it and look at their projections and what it would cost to finish. Mark M – That would be Cedar Rapids Bank and Trust. Michael – Start the conversation and see where it goes. Dick – I would assume that we don't have to point out to Gary that if he were to get that $900K check, we are at least going to prorate that. Mark – At this point in time, I think it makes more sense for Bob, and I think he is on board with this, to put money in to get the project finished. Michael – Bear in mind, that doesn't mean we are out of the woods, we still have a non-performing asset on the building at that point. The city did a new list of what they have to have.

**1-11-2018**

Capitalization of Interest – No Report. Diane - On McQuillen, we were supposed to see the appraisal yesterday. I sent an email and told them I would be contacting the appraiser.

**7-10-2018**

Robust discussion held regarding McQuillen.

## 8-14-2018
McQuillen Place, LLC
- Mark updated the group on the following:
  - We received the signed agreement and the $50K check from CRBT
  - Still waiting for the original documents from CRBT, of which the assignments need to be recorded.
  - Question was asked if there was proof of insurance. Discussion held on where things stand.
  - Set up weekly phone conferences with Larry Eide to ensure things keep moving.
- Action item: Diane will follow up on getting the proof of insurance.
- Action item: Diane will contact Larry weekly to updates.

Bob Thompson
- Mark updated the group on the following:
  - Mark met with Bob last week. Bob wants to get this done as quickly as possible but wants Mark to speak with his attorney.
  - Bob may need to borrow some of the money in order to pay the $900K guarantee.
    - Discussion held on who the lender should be for this loan.
    - If we are the lender, Mark stated the only way we would do this is if we take Bob's stock in KGB, Unlimited Spirit and probably an assignment of the remaining $500K life insurance policy.
- Action item: Mark will get loan closed with Bob by the end of August to collect on our guarantee.

Accounting issues related to McQuillen note
- Michael spoke with Eide Bailey on how to account for the $50K we received from CRBT. This will be booked to the Discount on Loans Purchased GL account (similar to the Wessels settlement).
- The McQuillen loan balance was grossed up to include the CRBT ending principal balance.
- Action item: Michael will oversee that the entry runs correctly and the McQuillen balance in Precision is updated.

## 9-11-2018
The committee reviewed the following reports:
- Ag Commercial QC report
- Adjustable Rate Pricing Audit
- Flood Determination Exceptions
- ALLL changes
- IA State past due averages
- Past Due vs State averages
  - Next month will do with and without McQuillen included
- Monthly extensions
- Potential non-accruals

- Monthly single pay loans
- Monthly credit rating updates
- Action item: Past Due report will be completed with and without McQuillen totals.

## 11-29-2018

Discussion Items – Diane - I saw an email sent today from Larry. What Kurt suggested is a group get together, get answers prior to meeting with Larry. A question I have on here, what would we be willing to take as a payoff if offered one? Mike F - Did Ralph ever come up with his buyer in Cedar Falls? He didn't end up talking to him. They are not interested in it if Charlie is involved. Maybe this is a discussion for board and holding company. Mark - I think this is a moot point. Just keep moving forward. Why would we want to wonder what it would take? Kurt- If they did, we want to respond quickly. From a negotiating standpoint, I wouldn't accept. If they did make us an offer for $2.5 million, I wouldn't immediately say yes, probably counter at $2.5 keeping Bob's $900 thousand guaranty. Mike F - So many moving parts, real estate taxes are due again in March, insurance is paid quarterly. Is the building heated now? To me, some of the ordinary every day quarterly and semiannual things are going to change our number. Are we going to continue to pay taxes? Mark – We are not paying any more until we get to Sheriff's sale in June. September is not paid and we will probably be faced with March taxes. Kurt - I am trying for more; the costs keep piling up. Mike F - What have we written off so far? Kurt -We have allocated $850 thousand. The month of December, should we consider a write down? Michael - Greg will be here. Mike - Bill will say for the benefit of the shareholders, charge some of this off. At some point in time, our overall book value, we need to get down to reasonable to accept an offer. Michael - That is what I think part of this discussion leads us to, if we are going to take $2.5 million, we need to do document what it is. Robust discussion held. Kurt- To Mark's comment, if they had $2.5 million that they were willing to spend on this, they would have shown some sign of life, they are not showing it. Collect or write us a check. Discussion held. Mike F - Any contact with IADA? Michael - No. Foreclosure discussion held. TIFF discussion held. Mark - There is a limited window for the IADA, end of next year, where they have to have the new buyer in. They want it completed by end of 2019.

Exhibit B
Summary Partial Invoice of Cornice & Rose

**MCQUILLEN PLACE, CHARLES CITY, IOWA    CORNICE & ROSE INVOICE SUMMARY**

**1 January 2012 - 24 April 2019**

| | | |
|---|---|---|
| 1 MARCH 2015  (1 Jan 2012 - 28 Feb 2015) | INVOICE | **$679,106.49** |
| 30 JANUARY 2013 | PAYMENT | **-$7,500.00** |
| 12 NOVEMBER 2013 | PAYMENT | **-$10,000.00** |
| 12 NOVEMBER 2013 | PAYMENT | **-$20,000.00** |
| 26 JANUARY 2015 | PAYMENT | **-$518,400.00** |
| 1 APRIL 2015 | INVOICE | **$54,084.35** |
| 1 MAY 2015 | INVOICE | **$75,176.16** |
| 1 JUNE 2015 | INVOICE | **$64,047.84** |
| 10 JUNE 2015 | PAYMENT | **-$52,467.00** |
| 10 JUNE 2015 | PAYMENT | **-$98,734.00** |
| 1 JULY 2015 | INVOICE | **$65,483.65** |
| 1 AUGUST 2015 | INVOICE | **$117,049.39** |
| 11 AUGUST 2015 | PAYMENT | **-$50,377.29** |
| 18 AUGUST 2015 | PAYMENT | **-$97,469.59** |
| 1 SEPTEMBER 2015 | INVOICE | **$185,636.98** |
| 25 SEPTEMBER 2015 | PAYMENT | **-$185,636.98** |
| 1 OCTOBER 2015 | INVOICE | **$192,608.46** |
| 1 NOVEMBER 2015 | INVOICE | **$145,081.55** |
| 2 NOVEMBER 2015 | PAYMENT | **-$92,608.46** |
| 1 DECEMBER 2015 | INVOICE | **$90,948.32** |
| 1 JANUARY 2016 | INVOICE | **$90,737.12** |
| 2 JANUARY 2016 | PAYMENT | **-$136,029.87** |
| 28 JANUARY 2016 | PAYMENT | **-$120,737.12** |
| 1 FEBRUARY 2016 | INVOICE | **$85,947.65** |
| 1 MARCH 2016 | INVOICE | **$77,390.61** |
| 28 MARCH 2016 | PAYMENT | **-$108,338.26** |
| 1 APRIL 2016 | INVOICE | **$116,678.39** |
| 1 MAY 2016 | INVOICE | **$139,598.97** |
| 6 MAY 2016 | PAYMENT | **-$141,678.39** |
| 1 JUNE 2016 | INVOICE | **$157,604.41** |
| 13  JUNE 2016 | PAYMENT | **-$109,598.97** |
| 1 JULY 2016 | INVOICE | **$169,425.73** |
| 18 JULY 2016 | PAYMENT | **-$16,389.25** |
| 26 JULY 2016 | PAYMENT | **-$195,239.86** |
| 1 AUGUST 2016 | INVOICE | **$125,061.98** |
| 1 SEPTEMBER 2016 | INVOICE | **$179,347.99** |

| Date | Type | Amount |
|---|---|---|
| 9 SEPTEMBER 2016 | PAYMENT | -$190,463.01 |
| 1 OCTOBER 2016 | INVOICE | $171,807.77 |
| 26 OCTOBER 2016 | PAYMENT | -$189,347.99 |
| 1 NOVEMBER 2016 | INVOICE | $263,821.59 |
| 17 NOVEMBER 2016 | PAYMENT | -$81,807.77 |
| 1 DECEMBER 2016 | INVOICE | $255,627.80 |
| 9 DECEMBER 2016 | PAYMENT | -$183,821.59 |
| 1 JANUARY 2017 | INVOICE | $253,377.64 |
| 11 JANUARY 2017 | PAYMENT | -$51,298.84 |
| 26 JANUARY 2017 | PAYMENT | -$159,328.66 |
| 1 FEBRUARY 2017 | INVOICE | $192,879.75 |
| 23 FEBRUARY 2017 | PAYMENT | -$40,377.64 |
| 1 MARCH 2017 | INVOICE | $208,145.70 |
| 15 MARCH 2017 | PAYMENT | -$135,879.75 |
| 1 APRIL 2017 | INVOICE | $168,749.78 |
| 14 APRIL 2017 | PAYMENT | -$23,145.70 |
| 1 MAY 2017 | INVOICE | $187,444.61 |
| 20 MAY 2017 | PAYMENT | -$128,749.78 |
| 1 JUNE 2017 | INVOICE | $204,582.63 |
| 16 JUNE 2017 | PAYMENT | -$22,027.54 |
| 1 JULY 2017 | INVOICE | $226,693.68 |
| 7 JULY 2017 | PAYMENT | -$61,238.31 |
| 1 AUGUST 2017 | INVOICE | $181,273.27 |
| 21 AUGUST 2017 | PAYMENT | -$15,455.37 |
| 1 SEPTEMBER 2017 | INVOICE | $143,219.04 |
| 1 OCTOBER 2017 | INVOICE | $90,146.94 |
| 1 NOVEMBER 2017 | INVOICE | $81,447.47 |
| 1 DECEMBER 2017 | INVOICE | $55,319.68 |
| 1 JANUARY 2018 | INVOICE | $40,109.90 |
| 1 FEBURARY 2018 | INVOICE | $24,680.00 |
| 1 MARCH 2018 | INVOICE | $29,157.50 |
| 1 AUGUST 2018 (1 March - 31 July 2018) | INVOICE | $62,280.00 |
| 1 MAY 2019 (1 Aug 2018 - 24 Apr 2019) | INVOICE | $109,217.50 |
| | BALANCE DUE | $2,516,851.30 |